IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Tyree Alphonso Roberts, a/k/a Abdiyyah ben Alkebulanyahh,<br><br>                      Plaintiff,<br><br>vs.<br><br>Jon E. Ozmint, Stan Burtt, Fred B. Thompson, and Charles Whitten,<br><br>                      Defendants. | Civil Action No. 6:05-2324-MBS-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

The plaintiff, a state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., all pretrial matters in cases filed under Title 42, United States Code, Section 1983, are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff is an inmate who has been sentenced to death for killing two Beaufort County sheriff's deputies (Nettles aff. ¶5). He has been housed since October 2003 on Death Row in Lieber Correctional Institution ("LCI"). In this action, the plaintiff is challenging his conditions of confinement. He has named as defendants Jon Ozmint, the Director of the South Carolina Department of Corrections ("SCDC"); Stan Burtt, the Warden of LCI; Fred Thompson, the Associate Warden of LCI; and Captain Charles Whitten, an officer assigned to Death Row. On January 20, 2006, the defendants moved for summary

judgment. By order filed January 23, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The plaintiff filed his response to the defendants' motion on March 31, 2006. The plaintiff filed his own motion for summary judgment on January 17, 2006. The defendants filed their response to that motion on February 5, 2006.

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### *Grooming Policy*

The SCDC's Grooming Policy, OP-22.13, which was enacted on March 20, 2004, provides, "All male inmates' hair must be neatly cut (not to exceed one inch in length) and must remain above the shirt collar and above the ear (not touching the ear)," and "no inmate will be permitted to wear a beard . . . ." The policy further provides, "Inmates may be given forced haircuts or shaves if they refuse to comply with the haircut and shave policy" (Burtt aff. ¶ 5, ex. A). Even prior to the March 20, 2004, policy, all Death Row inmates were subjected to a haircut and shave upon arrival on Death Row, according to Warden Burtt (Burtt aff. ¶ 5, ex. C, SCDC Policy OP-22.16 ).

The plaintiff alleges that the enforcement of the SCDC's Grooming Policy on October 22, 2003, when he was first brought to Death Row, violated his First Amendment

3

rights[1] (comp. at 4).  He contends that he refused to submit to a haircut because of his religious beliefs as a Rastafarian, but his hair was nonetheless cut against his will.  The constitutionality of the SCDC Grooming Policy has previously been litigated and upheld in *Hines v. South Carolina Dept. of Corrections*, 148 F.3d 353 (4th Cir. 1998).  In *Hines*, the Fourth Circuit Court of Appeals recognized that "the Grooming Policy was implemented to help eliminate contraband, reduce gang activity, identify inmates, and maintain order in South Carolina's prisons."  *Id.* at 358.  The court further held that "although the Grooming Policy may have an incidental effect of preventing the Inmates from wearing their hair and beards as their religion prescribes, under *[Employment Division v.] Smith*, [494 U.S. 872 (1990)], the Grooming Policy is a neutral and generally applicable regulation and, therefore, does not violate the Free Exercise Clause."  *Id.*  The court concluded that the Grooming Policy serves legitimate and even compelling penological interests.  Thus, the court upheld the Grooming Policy against a First Amendment challenge finding that the policy "is an eminently rational means of achieving the compelling governmental and penological interests of maintaining order, discipline and safety in prisons."  *Id*.

As noted by the defendants, subsequent to the decision in *Hines*, inmates who were subjected to forced haircuts against their religious beliefs have attempted to make arguments similar to those made by the plaintiff.  For instance, in the case of *Strong v. Ozmint*, Civil Action No. 2:03-2256-24AJ, U.S. Magistrate Judge Robert S. Carr recommended the denial of a motion for temporary restraining order and/or preliminary injunction filed by an inmate seeking to enjoin SCDC officials from forcefully cutting his hair and beard.  Judge Carr's report and recommendation was subsequently adopted by U.S. District Judge Margaret B. Seymour in her order filed March 23, 2004.  Moreover, the Fourth Circuit Court of Appeals adopted the reasoning of the lower courts in affirming the denial of

---

[1] The plaintiff has not pled a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

the motion seeking to enjoin enforcement of the Grooming Policy. *Strong v. Ozmint*, No. 04-6664, 2004 WL 1790208, *1 (4th Cir. 2004) (unpublished). *See also Caprood v. Moore*, C.A. No. 0:98-0603-22BD (D.S.C. 1999) (denying motion for preliminary injunction to stop prison officials from using force to cut the inmate's head or face hair), *aff'd*, 1999 WL 651848 (4th Cir. 1999); *Smith v. Casey*, C.A. No. 0:97-2034-23BD (D.S.C. 1998) (denying motion for preliminary injunction to stop prison officials from enforcing SCDC's Grooming Policy).

In their affidavits in support of summary judgment, defendants Warden Burtt and Associate Warden Thompson describe some of the reasons for the Grooming Policy. These reasons include the risk of an inmate being able to drastically change his appearance if he escapes if he is allowed to keep his hair and/or beard long (*see* photographs of plaintiff before and after haircut, Thompson aff., ex. A), the reduction of health risks associated with lack of personal grooming, and security risks in that contraband can be hidden in an inmate's hair and/or beard (Burtt aff. ¶ 5; Thompson aff. ¶¶ 5-7). Based upon the foregoing, the plaintiff's claim fails.

### *Religious Exercise Issues*

The plaintiff also asserts that his First Amendment rights were violated because religious services are held in the dayroom on Death Row and because he has been denied access to his "Holy Scripture and of any other type of Bible." Major Nettles testified as follows in his affidavit:

> As for the Plaintiff's allegations that he has been denied access to his religious materials, I know of no time when the Plaintiff has been denied access to his religious materials, except for brief periods of time when the Plaintiff was placed in the strip cell for behavioral issues and the religious materials were being searched for weapons and other contraband. However, the Plaintiff has a history of changing religions quickly. He came to Death Row claiming to be a Muslim, but now he is claiming to be a Rastafarian. If the plaintiff wants access to the primary "religious book" of the religion he claims to be, he need only

5

>request the book from the staff or from outside persons and it
>will be given to him after it is searched for contraband.

(Nettles aff. ¶ 19).

With regard to the plaintiff's claim regarding the use of the dayroom on Death Row for religious services, as noted by the defendants, the plaintiff's allegation is one primarily of disruption and inconvenience; he does not claim that he is compelled to participate in such religious services. He claims the services disturb his sleep (pl. resp. m.s.j. 8). The case of *Schwartz v. Jones*, No. 99-3269, 2000 WL 1859012 (E.D. La. 2000), is instructive on this issue. In that case, the inmate complained that his rights were violated because chaplains were permitted to conduct religious services in the dayroom of his dormitory. The court explained: "Plaintiff does not allege that he was forced to attend these services. Rather, he claims his rights were violated when he was not allowed to use that portion of the dormitory or dayroom while services were ongoing." The court found no constitutional violation based upon the inmate's mere inconvenience and temporary cessation of his recreation privileges. *Id.* at *5.

Likewise, in the present case, the plaintiff does not claim he is forced to participate in the services. The fact that he may hear the services does not violate his rights, and to the extent it does constitute an infringement, it is one that should be deemed tolerable in the prison setting. As explained by Major Nettles, the services must take place on Death Row for security reasons. The plaintiff need not participate or even listen to what is being said. In sum, as argued by the defendants, the plaintiff's complaints regarding alleged infringements on his religious exercise are *de minimis* at best and simply do not support a First Amendment claim.

6

***Access to the Courts***

In the plaintiff's fourth, fifth, and eleventh claims in his complaint, he alleges that he has been denied access to the courts. Specifically, he alleges he was denied access to legal and writing material, which hindered his ability to pursue a direct appeal and to seek redress for his conditions of confinement. The United States Constitution guarantees prisoners the right of meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 824, 828 (1977). In *Bounds*, the Supreme Court held that the right of access imposes an affirmative duty on prison officials to assist inmates in preparing and filing legal papers, either by establishing an adequate law library or by providing adequate assistance from persons trained in the law. *Id*. at 828. Prison officials are not required to provide both, as long as access to either the library or the trained personnel is "meaningful." *Id*. at 832.

In *Lewis v. Casey*, 518 U.S. 343, 349-52 (1996), the Supreme Court held that a prisoner must show some actual injury resulting from a denial of access in order to allege a constitutional violation. In *Cruz v. Hauck*, 515 F.2d 322 (5th Cir. 1975), the court noted that "access to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate devise of the State." *Id.* at 331.

Major Nettles testified as follows in his affidavit:

> With regard to Death Row inmates' access to legal materials, per policy the Death Row inmates are not allowed to actually go down to the library, but they are allowed to request up to three legal books a day, and can get up to three more when they have returned the ones they have already checked out. The requested books are brought the next day to Death Row and left with the inmate.

(Nettles aff. ¶ 18).

The plaintiff has been able to pursue the present case and has also been able to file a subsequent action in this court. *See Alkebulanyahh v. SCDC,* C.A. No. 6:05-2525-MBS-WMC. Further, the defendants note that the plaintiff has been involved in the direct

7

appeal of his death sentence. He was able to file a *pro se* petition with the South Carolina Supreme Court seeking to proceed *pro se* with his appeal. The court denied the motion, finding that the plaintiff did not have a federal or state constitutional right to proceed *pro se* in his direct appeal. Importantly, the court pointed out that the plaintiff was "represented by two very experienced capital appeals litigators." *State v. Roberts*, 614 S.E.2d 626, 629 (S.C. 2005). The plaintiff argues that his motion before the South Carolina Supreme Court was untimely, and this shows that he was injured by denial of access to the courts (pl. resp. m.s.j. 11-12). However, the plaintiff has presented no evidence showing the defendants' conduct in any way impeded his ability to file a timely motion. Further, as set forth above, the plaintiff had appointed counsel for his direct appeal, and it does not appear that the timeliness of the motion was dispositive of the issue before the South Carolina Supreme Court. Conclusory allegations, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). Based upon the foregoing, the claim fails.

### *Privacy*

The plaintiff next contends that his Eighth Amendment rights have been violated because he can be observed by female correctional officers while he is naked and while using the toilet. He does not allege that any specific female officer observed him naked on any specific date.

While the plaintiff claims his Eighth Amendment rights were violated, most courts have analyzed such claims under the Fourth Amendment. In *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981), the Fourth Circuit addressed the issue of an inmate's right to privacy:

> Persons in prison must surrender many rights of privacy which
> most people may claim in their private homes. Much of the life
> in prison is communal, and many prisoners must be housed in
> cells with openings through which they may be seen by guards.

> Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons.

*Id.* at 1119. The court thus applied a "reasonably necessary" standard. Yet, the court also recognized that "the general employment of guards may be required to be open to persons of both sexes under equal employment opportunity legislation." *Id.* at 1119-20. Following *Lee*, district courts in this Circuit have applied the test from *Turner v. Safley*, 482 U.S. 78 (1987), to assess the reasonableness of allowing female officers access to male inmates even where there may be a minimal infringement of the inmate's right to privacy.

In *Riddick v. Sutton*, 794 F. Supp. 169 (E.D.N.C. 1992), the district court analyzed the scenario where female officers during routine patrols and checks of dormitories and bathrooms may occasionally observe male inmates either partially or totally nude while using the bathroom facilities. In applying the *Turner* standard, the court concluded that "there is clearly a rational relationship between the practice of surveillance of prisoners in the bathroom and shower areas by correctional guards of both sexes and the twin goals of maintaining internal security and equal employment hiring." *Riddick*, 794 F. Supp. at 172. Ultimately, the court ruled that the occasional observation of male inmates in a state of undress was a *de minimis* infringement of their privacy rights and is rationally related to a legitimate penological interest. *Id.* at 173.

Similarly, in *Hickman v. Jackson*, C.A. No. 2:03CV363, 2005 WL 1862425, **8-9 (E.D. Va. 2005), the district court focused on whether the exposure to female officers was a "minimal intrusion." Citing the Eighth Circuit case of *Timms v. Gunter*, 917 F.2d 1093 (8th Cir. 1990), the court explained that "minimal intrusions" would include "patrolling female guards who occasionally look through small windows in cell doors." Such "minimal intrusions" are regarded as a *de minimis* infringement of privacy rights and thus not

9

unconstitutional. The court agreed that "whatever 'minimal intrusions' the inmates faced 'were outweighed by institutional concerns for safety and equal employment opportunities.'" *Hickman*, 2005 WL 1862425, *8 (quoting *Timms*, 917 F.2d at 1102).

> Major Nettles testified in his affidavit as follows:
>
> There are some female officers that work on Death Row; however, the plaintiff's cell door contains only a small window and flap. The toilet in the cell is positioned that the front of the inmate cannot be viewed from the window when he is standing at the toilet. Furthermore, female officers are not assigned the duty of putting the male inmates in and out of the showers and thus do not have the opportunity to view the Plaintiff while in the shower.

(Nettles aff. ¶ 27). The defendants note that an inmate actually sitting on the toilet could use a towel or some other article of clothing to cover himself. Again, the plaintiff has not identified any specific problem or specific instances. As in the cases cited above, the limited exposure of the plaintiff to female officers is a minimal intrusion that is outweighed by institutional concerns for safety and equal employment opportunities. Accordingly, the claim fails.

***Cold Food***

The plaintiff next claims that he is "force[d] to eat unhealthy cold meals or starve" (comp. at 11). The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To succeed on any Eighth Amendment claim for cruel and unusual punishment, a prisoner must prove: (1) objectively, the deprivation of a basic human need was sufficiently serious, and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "'[I]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection

10

with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.'" *Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

The plaintiff has offered absolutely no evidence that the meals he is served are unhealthy. The menu of food served on Death Row is set by the nutritionist at the SCDC Headquarters. As for the temperature of the food, the food is prepared in a kitchen in close proximity to Death Row. Moreover, there is microwave in the dayroom of the Death Row cell block that inmates may access, and inmates with privileges are allowed to have "hot plates" in their cells (Nettles aff. ¶¶ 20-21). The plaintiff has failed to show that the meals served to him were nutritionally inadequate or caused him any serious or significant physical injury. This claim is frivolous and without merit.

### *Mice, Frogs, and Snakes*

The plaintiff next makes a general allegation of being forced "to dwell and cohabit with mice, frogs and snakes in a cell." John Sawadske, the Maintenance Supervisor at LCI, testified that he is not aware of any time when there have been infestations of pests in Death Row, and an exterminator does preventative maintenance every other month to prevent pests (Sawadske aff. ¶ 8). The plaintiff has failed to show both a serious deprivation of a basic human need and deliberate indifference to prison conditions by the defendants. Accordingly, the claim fails.

### *Temperature of Showers and Cell*

The plaintiff alleges that he is forced to take scalding hot showers and further complains that his cell is too cold. Mr. Sawadske testified as follows regarding the air and water temperatures on Death Row:

> By policy the air temperature at Lieber is to be kept at 68 degrees Fahrenheit in the Winter and 78 degrees Fahrenheit in the Summer, but there is some flexibility in regards to the temperature settings and I normally try to keep it a little warmer than 68 in the Winter and a little cooler than 78 in the Summer. I do this to try and keep the inmates comfortable, especially on Death Row, because it is my experience that when the inmates are comfortable with the temperature they tend to have less outbursts, making the environment at Lieber safer for me and my co-workers.
>
> As for the water temperature, I maintain the water temperature at around 120 degrees Fahrenheit to ensure that it is safe and will not scald anyone. The water heating unit serving the Death Row cell block is kept at this temperature, and, additionally, the water going to the showers is mixed with cold water before it reaches the shower heads, just like any shower facility.
>
> To my knowledge the air and water temperatures are kept within Policy ranges and are comfortable and safe. However, I am not able to accommodate [the preferences of] each and every one of our approximately 70 Death Row inmates all the time. . . . All I can do is keep the air and water temperatures at ranges that are within policy limits and are safe to everyone.

(Sawadske aff. ¶¶ 3-5). Mr. Sawadske also testified that he generally receives complaints that the showers are too cold and the air temperature is too hot, just the opposite of the complaints by the plaintiff (Sawadske aff. ¶ 7). The plaintiff has presented absolutely no evidence that he has suffered any injury related to the water or room temperatures. Further, he has failed to show deliberate indifference on the part of prison officials. Accordingly, his claim fails.

***Environmental Tobacco Smoke***

The plaintiff alleges that his Eighth Amendment rights are violated because he is forced to breathe second-hand tobacco smoke, also called environmental tobacco smoke ("ETS"). In *Helling v. McKinney*, 509 U.S. 25 (1993), the United States Supreme Court recognized that an inmate could assert an Eighth Amendment claim by alleging that prison

officials, acting with deliberate indifference, exposed the inmate "to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Id.* at 35. The Court explained that the inmate would need to prove both the subjective and objective prongs required to show an Eighth Amendment violation. The objective prong requires that the inmate prove that "he himself is being exposed to unreasonably high levels of ETS." *Id*. The Court further explained that the proof "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS." *Id.* at 36. Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id*. The subjective prong requires a showing of deliberate indifference by the prison officials. *Id.*

In the present case, the plaintiff makes only conclusory allegations and fails to allege any facts that would state a claim under *Helling*. The plaintiff has not alleged or proven that the level of ETS in the Death Row cell block is not within acceptable levels or poses an unreasonable risk of serious damage to his future health. Furthermore, he has not shown that the exposure created a risk of harm "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36. The plaintiff has thus not satisfied the objective prong of the analysis.

Likewise, the plaintiff cannot satisfy the subjective prong which requires proof that the defendants acted with deliberate indifference to the plaintiff's unreasonable exposure to ETS. Importantly, "*Helling* does not guarantee plaintiff a smoke free environment." *Mills v. Clark*, No. 99-6334, 2000 WL 1250781, *5 (4th Cir. 2000) (unpublished). Thus, the fact that there is some level of ETS in the Death Row unit is not evidence of deliberate indifference. Clearly, the prison officials in Death Row have taken steps to minimize the exposure to ETS. For instance, Section 15 of the Death Row policy, SCDC Policy #OP-22.16, provides that "[i]nmates will be allowed to smoke only in their cells and during outdoor recreation" (Burtt aff., ex. C). Moreover, the plaintiff is housed on the first

floor of the two-story Death Row cell block, which is designated non-smoking. For most of his incarceration on Death Row, the plaintiff has been classified as Level I, the highest and most restrictive classification on Death Row. Major Nettles testified in his affidavit that "on Level I, the inmates are not allowed to have cigarettes, because cigarettes must be purchased through the canteen and Level I inmates do not have access to the canteen" (Nettles aff. ¶ 22). He further attested: "In addition to the Plaintiff being housed on the non-smoking first floor surrounded by Level I inmates who are not allowed to purchase cigarettes, each cell on Death Row has a window and a 'trap' that can be closed by the inmate" (Nettles aff. ¶ 23). Thus, the plaintiff's exposure to ETS is minimal, as he is housed in an area of the cell block where smoking is not permitted. In light of the plaintiff's cell assignment as well as the smoking policy in the facility, there is no evidence that any of the defendants have acted or failed to act on this issue with deliberate indifference. Based upon the foregoing, the claim should be dismissed.

*Control Cell*

The plaintiff alleges that he was placed in a control cell or "strip cell" on January 21, 2004 (comp. at 7). He also complains of "paper gown treatment," wherein an inmate is stripped down to his underwear and placed in a paper gown (Nettles aff. ¶ 12). He appears to allege that such conditions violated his Eighth Amendment rights. He complains that he was clothed only in his underwear and was deprived of access to his personal belongings. The Fourth Circuit Court of Appeals has held that "'isolation from companionship, restriction on intellectual stimulation, and prolonged inactivity, inescapable accompaniments of segregated confinement, will not render that confinement unconstitutional absent other illegitimate deprivations.'" *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (quoting *Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854, 861 (4th Cir.1975) (en

14

banc)). The plaintiff does not allege nor can he show that he was denied any basic human needs.

The reason for the plaintiff's placement in the control cell was described by Major Nettles in his affidavit:

> On January 21, 2004, information was obtained by Officer Mitchell McCommons that the Plaintiff had made threats to take an officer or officers hostage and made threats about killing an officer. He stated that he would show the Department how Death Row should be run and that his actions would get publicity from a local television station. Because of those threats to the safety and security of the staff and the facility, a decision was made to made the Plaintiff in a control cell or strip cell at that time. Upon information and belief, the Plaintiff remained in the control cell at that time for only a few days.

(Nettles aff. ¶ 17, ex. A). The evidence submitted by the defendants shows that the plaintiff has repeatedly made threats against correctional officers and their families (Thompson aff. ¶¶ 9-11). These threats include a letter in which the plaintiff admitted to trying to kill staff members and a letter in which in he threatened the lives of Major Nettles and his family. Also, in an Inmate Grievance Form, the plaintiff threatened the lives of Warden Burtt, Major Nettles, another staff member, and their families. According to Associate Warden Thompson, because of these threats, the plaintiff has been on the most restrictive area of Death Row for most of his incarceration, and he has been placed on "paper gown" treatment on more than one occasion (Thompson aff. ¶¶ 9-11).

On January 21, 2004, the plaintiff made threats of taking hostages and killing officers. The use of a control cell under such circumstances to maintain security of the facility, to conduct a thorough search of the plaintiff's property, and to control the plaintiff who was acting out is not violative of the Eighth Amendment. Importantly, prisons are not designed to be comfortable, and because the plaintiff's own behavior caused the deprivations of which he now complains, he cannot state a violation of his Eighth Amendment rights.

15

***Equal Protection and Due Process Claims***

In his sixteenth claim, the plaintiff alleges that he has been denied due process and equal protection. The plaintiff fails to allege any facts to support that claim. Conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).

***Qualified Immunity***

The defendants further argue that they are entitled to qualified immunity in their individual capacities. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because

government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights. Therefore, the defendants are entitled to qualified immunity on these claims.

***Plaintiff's Motion for Summary Judgment***

On January 17, 2006, the plaintiff filed a "motion for demand of judgment in favor of plaintiff," in which he alleges that grievances he has filed have not been processed and that other grievances have not been timely processed. He complains primarily regarding the conduct of L. Carrington, the Inmate Grievance Coordinator at LCI. As argued by the defendants, L. Carrington is not a party-defendant in this action, and the plaintiff is seeking judgment on a claim that was never pled as a cause of action in his complaint. Based upon the foregoing, the motion should be denied.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the defendants' motion for summary judgment should be granted, and the plaintiff's motion for summary judgment should be denied. The plaintiff's pending nondispositive motions will be held in abeyance pending the district court's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, these motions will be rendered moot.

s/William M. Catoe
United States Magistrate Judge

May 23, 2006

Greenville, South Carolina